UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br><br>    For herself and the class,<br><br>                    Plaintiff,<br><br>    v.<br><br>ATRIUS HEALTH, INC.<br><br>                    Defendant. | Civil Action No. _____<br><br>[Superior Court Department of the Trial Court Business Litigation Session Case No. 2384CV00597-BLS1]<br><br>**DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1)** |

## NOTICE OF REMOVAL

For more than fifteen years, the federal government has engaged non-governmental entities to help construct a nationwide health information technology infrastructure designed to improve patient engagement and access to care. Since 2011, Atrius Health, Inc. ("Atrius" or "Defendant") has served as one of those entities. Plaintiff Jane Doe now challenges Defendant's efforts to implement the federal government's directives and promote patient engagement and access to care. Atrius removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and sets forth below a "short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a).

## NATURE OF THE REMOVED ACTION

1. On March 10, 2023, Plaintiff filed a Class Action Complaint ("Complaint") against Atrius in the Business Litigation Session of Suffolk County Superior Court, Case No. 2384CV00597-BLS1. Atrius accepted service on March 28, 2023. *See* Ex. A, Stipulation of Service.

2. Atrius is a non-profit multi-specialty, multi-site medical group practice in Eastern Massachusetts. An early adopter of electronic health records ("EHR") and data analytics, Atrius

1

delivers a system of connected care for adult and pediatric patients. Atrius maintains a website, https://atriushealth.org/ (the "Atrius Website"), which Plaintiff alleges enables "healthcare consumers [to] obtain information about the services Atrius provides, including information about doctors, services, and treatments provided by Atrius for particular medical conditions." Compl. ¶ 14; *see also id.* ¶¶ 15-16.

3. Plaintiff further alleges that Defendant deployed analytics tools on the Atrius Website offered by technology and social media companies such as Google or Facebook.[1] *See* Compl. ¶¶ 1-2, 24, 92(a)-92(d). One of the tools Atrius has allegedly used is known as "Google Analytics," a "free" website analytics technology. *Id.* ¶ 37. According to the Complaint, "information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website." *Id.* Another tool Atrius allegedly used but then removed is Facebook's "Meta Pixel," *id.* ¶¶ 30, 54, a "'snippet of JavaScript code,'" that enables logging of "visitor activity" on a website," *id.* ¶¶ 31.

4. Federal and state governments as well as organizations across the country use website analytics technologies such as Google Analytics and the Meta Pixel to improve their website functions and user experience. For example, the Privacy Policy on the website Medicare.gov states: "We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon . . . in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon." Ex. B, Medicare.gov, *Privacy Policy* at 5; *see also* Ex.

---

[1] The Complaint refers to the technology companies Google LLC and Meta Platforms, Inc. as "Google" and "Facebook," respectively. *See* Compl. ¶¶ 27, 34. This Notice of Removal does the same.

2

C, CMS.gov, *Privacy Policy* at 4 (same disclosure in privacy policy). Similarly, the Privacy Policy for Mass.gov, which includes websites for various courts in the Commonwealth, states: "The use of cookies is standard practice among Internet websites. Mass.gov uses cookies and tools for data collection and analytics to learn more about how visitors to Mass.gov find and interact with the pages they visit. We may use this information to improve our service offerings and better tailor individual user experience." *See* Ex. D, Mass.gov, *Privacy Policy* at 2-3.

5. Here, Plaintiff alleges that analytics technologies installed on the Atrius Website caused a user's browser to execute embedded JavaScript code, which in turn caused "the user's web browser to retrieve a file from [a] third-party website" and then subsequently "communicate certain information to the third-party website." Compl. ¶¶ 47-49. That information could include the Uniform Resource Locator ("URL") of the webpage visited as well as other information about the webpage and user interaction with the webpage. *Id.* ¶ 49. The Complaint does not allege that these technologies communicated social security numbers, medical insurance numbers, birth dates, or medical test results to third-party websites.

6. Plaintiff alleges that she is a patient of Atrius and "regularly uses the Atrius Website." *Id.* ¶ 10. She purportedly uses the Atrius Website to "(i) search for and obtain information about Atrius doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review medical records through the website's patient portal." *Id.* She does not allege whether she has or had a Facebook or Google account, or an account with any of the other technology or social media companies referenced in the Complaint. She also does not allege when and where she accessed the Atrius Website or what specific pages of the Atrius Website she visited. Nor does she allege what browser she used to access the Atrius Website or how it was configured.

7.      Based on these allegations, Plaintiff alleges that Atrius "aided" so-called "interceptions" by Google, Facebook, and other third parties of user communications with the Atrius Website.  Plaintiff asserts a single claim against Defendant on behalf of herself and a putative class of Massachusetts residents under the state wiretap statute, Mass. Gen. Laws Ann. ch. 272 § 99.  Compl. ¶¶ 104-11; *see id.* ¶ 96 (defining the putative class).

## BASIS FOR REMOVAL

8.      Pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a), Atrius removes this case to federal court.  The statute authorizes the removal of state court cases against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  *Id.* § 1442(a)(1).

9.      There is no presumption against federal officer removal, *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 38-39 (D. Mass. 2020), and under binding Supreme Court precedent, the federal officer removal statute must be "liberally construed."  *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007).  Private defendants routinely remove state court actions under this statute when acting under color of federal office.  *See, e.g.*, *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022).

10.     To meet the low bar for removal, the defendant must show (1) it is a "person" under the statute and was "acting under a federal officer's authority," (2) that "the charged conduct was carried out 'for or relating to' the asserted official authority," and (3) that the defendant "will assert a colorable federal defense."  *Moore*, 25 F.4th at 34 (citation omitted).

11.     Atrius meets each of these requirements.  First, companies qualify as "person[s]" under the statute, so Atrius clearly meets this threshold element.  In addition, Atrius acted under federal officer authority because it developed its website and patient portal in conjunction with a

4

series of federal programs that sought to create a nationwide health information technology infrastructure. Second, the alleged conduct at issue in the Complaint was carried out "for or relating to" federal incentive and interoperability initiatives centered on Medicare and Medicaid, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First program. Through these initiatives, the federal government provides monetary incentives and guidance to providers, including Atrius, to enhance patient engagement and expand online access to their EHR. Under federal direction, Atrius has gathered data demonstrating expanded patient access and improved patient engagement. Third, Atrius intends to assert multiple colorable federal defenses to Plaintiff's claim for relief.

12. Courts across the country have upheld federal officer removal in similar privacy class actions against healthcare defendants related to their websites. *See Doe v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use [p]rogram, it was 'acting under' DHHS when it engaged in the conduct that is at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) ("Because Defendant's participation assisted the federal government in achieving that goal [creating an interoperable system of patient EHR], Defendant has satisfied the 'acting under' prong.").[2] Removal is proper here as well.

---

[2] Other district courts have reached different conclusions, including Judge Stearns in a margin order issued in *Doe v. Cape Cod Healthcare, Inc.*, No. 23-cv-10080, (D. Mass. Jan. 25, 2023), ECF No. 10, *appeal filed*, No. 23-1149 (1st Cir. Feb. 2, 2023). Atrius respectfully disagrees with these decisions, which overlook the extent to which the federal government is obligated to facilitate construction of infrastructure to support interoperable health information technology, fail to acknowledge the contractual obligations entities like Atrius undertook when they agreed to participate in federal incentive programs, and ignore the significant guidance the federal government provided to private entities regarding implementation of this infrastructure.

*Background on Federal Programs*

13. For a period of nearly twenty years, the federal government has endeavored to spur the creation of infrastructure sufficient to support the implementation of interoperable health information technology across the country. This project began in 2004 when President George W. Bush signed an Executive Order calling for the establishment of the Office of the National Coordinator for Health Information Technology ("ONC") within the Department of Health and Human Services ("HHS"). *See* Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). President Bush directed the ONC to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology." *Id.*

14. In the Health Information Technology for Economic and Clinical Health Act of 2009, Congress followed up on that executive action, *see* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 230 (2009), codified as 42 U.S.C. § 300jj *et seq*, and directed billions of dollars of federal funds to the Centers of Medicare and Medicaid Services ("CMS") within HHS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." 42 U.S.C. § 300jj-31(a).

15. Following that mandate, the ONC enlisted private healthcare providers, including Atrius, to help build the nationwide infrastructure. In doing so, the ONC recognized that private healthcare providers are essential to the development of the Congressionally-directed infrastructure precisely because they have direct access to patients. The government has therefore tried to augment "a provider's ability to influence patient engagement by providing a wider range

of technologies and methods for a patient's use."  Medicare and Medicaid Programs; Electronic Health Record Incentive Program-Stage 3 and Modifications to Meaningful Use in 2015 Through 2017, 80 Fed. Reg. 62,761, 62,848 (Dec. 15, 2015).

16. To achieve these goals, the ONC issues guidance to private providers in the form of strategic plans.  For instance, in the 2015–2020 plan, the ONC required "federal agencies" to "collaborate with . . . private stakeholders to . . . [b]uild a culture of electronic health information access and use."  Ex. E, ONC, *Federal Health IT Strategic Plan 2015-2020* at 7.  The 2020–2025 plan underscores the collaboration that has already occurred: "Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare."  Ex. F, ONC, *Federal Health IT Strategic Plan 2020-2025* at 2.

17. Medicare and Medicaid EHR incentive and interoperability initiatives have been at the center of these federal efforts.  For instance, CMS established the Meaningful Use program in 2011, which has been followed by various other initiatives and programs.  *See* 42 C.F.R. §§ 495.2–495.370.  The goal of these initiatives has been to increase patients' "meaningful use" and engagement with their EHR.  *See* Ex. G, CMS, *Promoting Interoperability Programs* at 1.

18. Since 2011, federal EHR interoperability initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program, have offered incentive payments to Medicare and Medicaid providers when they provide program reports and meet specific criteria for increasing patient engagement.  *See id.* (noting history of interoperability programs); *see also* Ex. H, CMS, *Traditional MIPS Overview* at 1-3  (describing promoting interoperability component); Ex. I, CMS, *2021 Promoting Interoperability: Traditional MIPS* at 1-2 (describing 2021 MIPS requirements for Promoting Interoperability component).

19. The program requirements for increasing patient engagement include implementing certified EHR technology based on federal standards and technical specifications to facilitate patients viewing their medical records. *See* 45 C.F.R. § 170.315. Once ONC certifies that a particular technology complies with federal standards, the developer can market the product to healthcare providers. To meet the numerous federal requirements, CMS recommends that providers create patient "portals" to facilitate access to providers and EHR. CMS has explained that the portals "must be engaging and user-friendly," and to make that happen, providers should "actively promote and facilitate portal use." Ex. J, ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* at 1 (2013).

20. HHS requires program participants to show patients' increased engagement over time. Those providers that meet the specified engagement criteria, qualify for higher federal payments. *See* 42 U.S.C. § 1395w-4.

21. For instance, one objective of the Meaningful Use program was to "[p]rovide patients the ability to view online, download, and transmit their health information within 4 business days of the information being available to the [provider]." 42 C.F.R. § 495.22(e)(8)(i). To meet that objective, providers had to show that more than fifty percent of Medicaid patients received access to view, download, and transmit their health information to a third party—a percentage that went up over time. *Compare id.* § 495.22(e)(8) (fifty percent in 2015), *with id.* § 495.24(d)(5)(i)(B) (eighty percent in 2019).

22. In addition to the Meaningful Use program and MIPS initiatives promoting interoperability, CMS created another program, the Primary Care First program, that incentivizes physicians who may not participate in the other initiatives. Under the Primary Care First program, CMS enters into participant agreements with certain providers to, among other things, further

8

incentivize patient access and EHR interoperability. *See*, *e.g.*, Ex. K, Primary Care First Program Participation Agreement. For instance, participants must ensure that patients receive access to their EHR within one business day and that their EHR technology enables a patient to "[i]dentify, record, and access information directly and electronically shared by a patient." 45 C.F.R. § 170.315(e)(3).

23. Aside from incentive programs, CMS also provided an example of how to engage with beneficiaries: it created its own portal and promoted patient engagement through the use of third-party services on its websites. By working with over two dozen third-parties, CMS is able to "collect basic information about visits to Medicare.gov." *See* Ex. B at 4. CMS "use[s] third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov." *Id.* at 5. These services include "the use of web beacons (also called pixels)," which CMS uses "to better target Medicare advertisements." *Id.*

24. CMS also engaged Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of a CMS website. [This] allows Facebook Ads to measure the performance of CMS advertisements based on consumer activity and to report the ad performance to CMS." Ex. L, HHS, *Third Party Websites and Applications Privacy Impact Assessment – Facebook Ads* at 2 (Sept. 4, 2018).

### *Atrius is a "person"*

25. Federal officer removal can be effectuated by "any person acting under" a federal officer. 28 U.S.C. § 1442(a)(1).

26. Courts have repeatedly held that corporations qualify as "person[s]" under the statute. *See, e.g.*, *Moore,* 25 F.4th at 34–38; *see also Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 & n.9 (1st Cir. 2009).

27. Atrius is a Massachusetts non-profit corporation, Compl. ¶ 11, and thus qualifies as a "person."

### *Atrius is "acting under" Federal Authority*

28. The "acting under" element for federal officer removal must be "'broad[ly]'" and "'liberally construed.'" *See Moore*, 25 F.4th at 34 n.3 (citation omitted). This element involves "an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original).

29. Atrius readily meets this requirement. First, on behalf of itself and its providers, Atrius has been a longstanding participant in Medicare and Medicaid EHR incentive programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program. Atrius has assisted and continues to assist the federal government in carrying out its goal of creating a nationwide healthcare information technology infrastructure through its participation in these programs. *See* Ex. F at 23-39. This work has included development of its patient portal to meet interoperability standards and efforts to increase patient access and engagement as well as filing hundreds of reports attesting to this work. *See* Ex. M, Monsen Decl. ¶¶ 6-7.[3]

30. Second, the government has modeled how to best enhance patient engagement. That includes development of a patient portal and analyzing patient engagement, including with digital marketing tools. Furthermore, the federal government has shown participants how to enhance patient engagement on its own websites by using third-party services to analyze users'

---

[3] Dr. Craig Monsen is Atrius' Chief Medical Information Officer and Associate Chief Information Officer. *See* Ex. M ¶ 2. In those roles, he has "provide[d] guidance to internal teams developing Atrius' electronic patient portal" and has gained familiarity with Atrius' "participation in and involvement with federal incentive and interoperability initiatives, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First program." *Id.* ¶¶ 4-5.

engagement with those websites, including on the CMS website and the HHS website.  *See* Ex. C at 3-4; Ex. N, HHS.gov, *HHS Privacy Policy Notice* at 8-11.

31. Third, the federal government has created an office devoted to promoting patient engagement with health records and closely monitors private providers' work to achieve that goal.  In exchange for carrying out the work of improving patient access and engagement, Atrius and other private providers have received payments and direction through various federal programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program.  *See* Ex. M ¶ 8.  Such exchanges are akin to a government-contractor relationship.  *See Moore*, 25 F.4th at 34 n.3.

32. Finally, the Primary Care First program includes promoting interoperability and patient access to records as an element of improving patient care.  As part of this program, Atrius has entered into Primary Care First participation agreements for almost all of its clinical facilities, ensuring that it attains the interoperability benchmarks that are part of the federal government's efforts to improve primary care and interoperability.  *See* Ex. K at 82-83; Ex. M ¶ 9.

33. Atrius developed its website to promote patient engagement and access to EHR, including through its portal, while at the same time raising awareness and usability of its website and portal.  Ex. M ¶ 10.  These efforts enabled Atrius to meet the objectives set forth in the government's incentive initiatives.  *Id.*  The federal government would not be able to "carry out" these important federal healthcare initiatives without the assistance of providers like Atrius.  *Watson*, 551 U.S. at 152.

### Atrius' Conduct Taken "for or relating to" the Asserted Federal Authority

34. The "for or relating to" element means that the Plaintiff's claim must be "related to" the activity Atrius took while "acting under" the federal officer.  *See Moore*, 25 F.4th at 35–

36. "No causal link is required," and the required nexus "is not to be understood as anything more than a 'related to' nexus." *Id.* at 35. The Supreme Court has stated "that the ordinary meaning of the phrase 'relating to' is 'a broad one,' holding that it normally means in 'association with or connection with.'" *Id.* at 35 n.4 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992)).

35. The Complaint centers on Defendant's alleged use of commonplace website analytics tools, such as Google Analytics and the Meta Pixel. *See, e.g.*, Compl. ¶¶ 55-92. As Plaintiff alleges, and the government's own use of such tools shows, these technologies enable a website owner to review user activity and engagement and assess website functionality. *See*, *e.g.*, *id.* ¶¶ 30-32, 37. Plaintiff thus challenges development of Atrius' website, which was designed to help promote patient engagement. Indeed, in support of her claim that Atrius violated the Massachusetts wiretap statute, *see id.* ¶¶ 104-111, Plaintiff points to a button on the "Atrius landing page" that enables users to access Atrius' "MyHealth Online" portal, which is "available on nearly every page on the website." *Id.* ¶ 73. According to the Complaint, when a user clicks the button, information about the fact of that click is transmitted to third parties like Google. *Id.* Facilitating access to the portal, including by providing multiple links on the Atrius Website, was one way Atrius implemented requirements for interoperability and engagement. *See* Ex. M ¶¶ 6-10. Plaintiff's claim clearly "relat[es] to" Defendant's role in carrying out the federal government's goal of creating a national healthcare information technology infrastructure.

36. In a similar case, *UPMC*, the plaintiffs there also asserted state law claims against a defendant healthcare provider based on alleged disclosure of personally identifiable information to third parties for marketing purposes and without the plaintiffs' knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The district court found that as a Meaningful Use participant,

"UMPC must, among other things, raise awareness and increase usability of the UPMC website and [its] portal." *Id.* at *6.  The court concluded that challenging transmission of information to third parties, such as Facebook, "plainly" established "a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." *Id.*  The same is true of Plaintiff's claim here.

### *Atrius' Colorable Federal Defenses*

37.     The final element for removal under Section 1442 merely requires that the defendant assert a "colorable federal defense."  *See Mesa v. California*, 489 U.S. 121, 129-30 (1989) (colorable federal defense is "defensive" and "based in federal law").  A federal defense is "colorable" as long as it is not "wholly insubstantial and frivolous," even if it is not "clearly sustainable." *Moore*, 25 F.4th at 37 (citations omitted).

38.     Atrius intends to argue that Plaintiff's state law claim is preempted in whole or in part under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), which instructs that federal preemption applies where the relationship between defendant and the government is "inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 347.  Such arguments are best resolved by the federal courts, as their resolution turns on the interpretation of federal law. *See id.* at 353 (finding that the plaintiffs' state law claims were preempted where "the existence of [ ] federal enactments" formed "a critical element in [the plaintiffs'] case").

39.     Here, Atrius followed the directives of the federal government to develop and maintain a website designed with the purpose of facilitating and promoting patient access to her and engagement.  Thus, the relationship between Defendant and the federal government is

13

"inherently federal in character." *Id.* at 347. Other courts have reached this conclusion. *See UPMC*, 2020 WL 4381675, at *7 ("Having already found that UPMC was 'acting under' DHHS when it engaged in the complained-of conduct, it follows that the relationship between UPMC and DHHS is 'inherently federal' in nature, such that the issue of whether Plaintiffs' state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court.").

40. In addition, Atrius has a colorable federal defense to Plaintiff's claim for relief under the dormant Commerce Clause, which "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). Put another way, "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332 (1989) (citation omitted). A state law that imposes a "burden" on interstate commerce that is clearly excessive in relation to the putative local benefits also violates the dormant Commerce Clause. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007). The regulation of internet-based commerce will often implicate the dormant Commerce Clause, as "it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (quoting *Healy*, 491 U.S. at 334).

41. That is exactly what Plaintiff's interpretation of the Massachusetts wiretap statute would do. While Plaintiff purports to limit the putative class to Massachusetts residents who accessed the Atrius Website while inside the Commonwealth, Compl. ¶ 96, Plaintiff's interpretation of Massachusetts law would impact commercial activity far beyond the borders of the Commonwealth. Countless organizations across the country with websites that contain analytic tools would face liability under Plaintiff's reading of the Massachusetts wiretap statute,

14

even if just one person accessed the website while in the Commonwealth. Massachusetts law would therefore regulate commerce outside of the Commonwealth, forcing organizations to conform their websites regardless of any nexus to Massachusetts. There is at least a colorable argument that such an extension of Massachusetts law would run afoul of the dormant Commerce Clause. *See UPMC*, 2020 WL 4381675, at *7 (finding a colorable federal defense based on the dormant Commerce Clause where the provider's "website and patient portal 'provide[d] an easily accessible, interstate (and international) platform'").

42. Atrius may identify additional defenses that involve federal law as it continues to review the Complaint.

## PROCEDURAL REQUIREMENTS

43. All the procedural requirements for removal under 28 U.S.C. § 1446 are satisfied.

44. Atrius is filing this Notice of Removal within thirty days of "formal" acceptance of service of the Complaint, which occurred on March 28, 2023. 28 U.S.C. § 1446(b); *see also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999) (noting that "formal service" is required to start the thirty day period pursuant to § 1446(b)).

45. This Court is the corresponding federal court for the Business Litigation Session of Suffolk County Superior Court of the Commonwealth of Massachusetts, where the suit was originally filed. Venue is therefore proper under 28 U.S.C. §§ 101 and 1441(a).

46. Atrius has attached a copy of the Complaint and all other publicly available filings from the state court docket as Exhibits A, O-T.

47. Upon filing this Notice, Atrius will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Business Litigation Session of Suffolk County Superior Court. 28 U.S.C. § 1446(d).

**WHEREFORE**, Notice is given that this action is removed from the Business Litigation Session of Suffolk County Superior Court of the Commonwealth of Massachusetts to the United States District Court for the District of Massachusetts.

Dated: April 27, 2023

Respectfully submitted,

By: */s/ Anthony E. Fuller*

Anthony E. Fuller (BBO #663246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-100
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing Notice of Removal and accompanying exhibits were sent via electronic mail and overnight delivery to:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER
& URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff Jane Doe, For herself and the Class*

/s/   Anthony E. Fuller
Anthony E. Fuller

*Counsel for Defendant*